**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **SCOTT WESTLAKE AND**<br>**VICKI WESTLAKE,**<br><br>      **Plaintiff,**<br><br>      **v.**<br><br>**BMO HARRIS BANK, NA,**<br><br>      **Defendant.** | **Case No. 13-2300** |

**MEMORANDUM & ORDER**

Plaintiffs Scott and Vicki Westlake brought this action against defendant BMO Harris Bank, NA ("BMO"),[1] alleging claims of breach of contract, conversion, promissory estoppel, unjust enrichment, and breach of agency contract. The parties have filed many motions but only one is before the court: BMO's motion for summary judgment (Doc. 124).

**I. Factual Background**

BMO's motion for summary judgment set forth 102 statements of fact. Plaintiffs, however, controverted only twenty-four. The following facts are undisputed.

On November 12, 2001, plaintiffs executed a Joint Management Agency Agreement (the "JMAA"), establishing a joint management agency account (the "Investment Account") to be held at Gold Trust Company ("Gold Trust").

In March 2003, plaintiffs executed and delivered to Gold Bank a promissory note in the original principal balance of $1,800,000 ("Loan 506"). They also executed an Assignment of Investment Properties/Securities (the "2003 Pledge Agreement").

---

[1] The parties filed a joint stipulation of voluntary dismissal with respect to defendant BMO Financial Corporation.

In March 2004, plaintiffs signed another promissory note in favor of Gold Bank in the original principal amount of $2,000,000 ("Loan 509").  Again, they executed an Assignment of Investment Property/Securities (the "2004 Pledge Agreement"), pledging the Investment Account as collateral for "[a]ll present and future debts from me [plaintiffs] to you [Gold Bank], even if this Agreement is not specifically referenced, the future debts are also secured by other collateral, or if the future debt is unrelated to or of a different type that this debt."  (Doc. 125-9 at 2, ¶ 1.B.)  It further provided that "[i]f more than one person signs this Agreement, each agrees that it will secure debts incurred either individually or with others who may not sign this Agreement."  (*Id*.)  As part of this transaction, plaintiffs, Gold Bank, and Gold Trust executed an Account Control Agreement (the "2004 Control Agreement"), under which plaintiffs acknowledged they pledged the Investment Account as collateral for loans from Gold Bank and agreed that Gold Trust would be obligated to "comply with entitlement orders originated by Gold [Bank] concerning the Account without consent by Debtor [plaintiffs]." (Doc. 125-10 at 2–3, ¶ 4.)

In February 2005, Gold Bank made loans to Old Corkscrew Golf Club, LLC ("OCGC") evidenced by two promissory notes executed by OCGC in favor of Gold Bank, which were amended and restated over the years (collectively the "OCGC Notes").

In January 2006, plaintiffs refinanced one of its loans, executing a promissory note in favor of Gold Bank in the principal amount of $3,000,000.  As part of this refinance, plaintiffs signed an Assignment of Investment Property/Securities (the "2006 Pledge Agreement"), which was virtually identical to the 2004 Pledge Agreement.

At some point in the first few months of 2006, M&I Marshall Illsley Bank ("M&I") succeeded Gold Bank via merger.  In March 2006, M&I loaned Old Corkscrew Plantation VII ("Felda")[2] a principal amount of $17,600,000.  In March 2006, Scott Westlake executed a guaranty agreement

---

[2] "Felda" is the term used by the parties in their briefing.  For clarity, the court will use that term throughout this opinion.

promising to pay the indebtedness owed to M&I by Felda in the maximum amount of $5,000,000 (the "Felda Guaranty").

In August 2006, BMO made loans to Old Corkscrew Plantation, LLC; Old Corkscrew Plantation II, LLC; Old Corkscrew Plantation III, LLC; Old Corkscrew Plantation IV, LLC; Old Corkscrew Plantation V, LLC; Old Corkscrew Plantation VI, LLC; and Felda in the principal amounts of $20,000,000 and $40,000,000.  That same day, Scott Westlake personally guaranteed, in part, those promissory notes pursuant to an unconditional, continuing guaranty agreement.[3]

In April 2007, Scott Westlake signed a commercial guaranty under which he personally promised to be responsible for the debt owed by Alico Lakeside, LLC to M&I, up to $333,000 (the "Alico Guaranty").[4]  In September 2007, plaintiffs executed a promissory note in favor of M&I in the principal amount of $3,000,000, representing a revolving line of credit (the "2007 Line of Credit").  As security for the 2007 Line of Credit, plaintiffs executed and delivered to M&I a Commercial Pledge and Security Agreement (the "2007 Pledge Agreement"), pledging the Investment Account as collateral for the 2007 Line of Credit.  Additionally, the 2007 Pledge Agreement contained a provision on the first page with the heading "CROSS-COLLATERALIZATION" which provides as follows:

> In addition to the Note, this Agreement secures all obligations, debts and liabilities, plus interest thereon, of Grantor to Lender, or any one or more of them, as well as claims by Lender against Grantor or any one or more of them, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due, direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated, whether Grantor may be liable individually or jointly with others, whether obligated as a guarantor, surety, accommodation party or otherwise, and whether recovery upon such amounts may be or hereafter may become barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter may become otherwise unenforceable.

---

[3] Another partial guaranty was made by Scott Westlake on October 25, 2007.
[4] Vicki Westlake did not sign the Alico Guaranty.

(Doc. 125-15 at 1.)[5]

In September 2008, plaintiffs executed another promissory note in favor of M&I in the principal amount of $3,000,000, representing a revolving line of credit (the "2008 Line of Credit"). Once again, plaintiffs executed a Commercial Pledge Agreement (the "2008 Pledge Agreement"), granting M&I a security interest in the Investment Account as collateral for the 2008 Line of Credit. It also contained a cross-collateralization provision identical to the one above.

In August 2009, Scott Westlake personally guaranteed, in part, OCGC's obligations under the OCGC Notes pursuant to an Amended and Restated Guaranty Agreement (the "OCGC Guaranty").

In November 2010, an M&I loan officer sent a letter to OCGC and its guarantors, including Scott Westlake, which outlined and rejected OCGC's proposal for the guarantors to inject capital into OCGC in exchange for a reduction of their guaranty liabilities. In that letter, M&I also stated:

> In order to avoid any unnecessary confusion on the part of any party going forward, you should understand that no commitments, assurances, discussions or agreements on behalf of M&I Marshall & Ilsley Bank with respect to the Loan Documents shall be effective and may not be relied upon unless in writing (email communications are considered to be the same as verbal communications and not a form of written commitment) and duly executed on behalf of M&I Marshall & Ilsley Bank.

(Doc. 125-20 at 3.)

On December 16, 2010, Mike Cross, a BMO representative,[6] sent an email to Scott Westlake proposing five terms as part of negotiations between OCGC and BMO:

1. Scott Westlake injects $250,000 into the golf course to bring its vendors current and pay interest to BMO;
2. Scott Westlake receives a $250,000 credit against his guaranty reducing it to $1,250,000 which will be reaffirmed at closing;

---

[5] The court notes that the differences between the 2004/2006 Pledge Agreements and the 2007 Pledge Agreement—such as the introduction of the cross-collateralization provision—appear to be directly related to the difference in form contract language used by Gold Bank & M&I. Indeed, the contracts themselves look completely different. (*Compare* Doc. 125-12 *with* Doc. 125-18.)

[6] Technically, Mike Cross was a representative for M&I Bank on December 16, 2010. But, effective on or about December 17, 2010, M&I was absorbed into BMO.

3. OCGC and the Guarantors have the right through May 31, 2011, to pay-off the loan to BMO for $7,000,000;

4. In the event BMO does not receive the $7,000,000 on the golf course loan, Scott Westlake's guaranty reverts back to the original amount of $1,500,000;

5. BMO will consent to Scott Westlake's request to obtain an option to purchase OCGC's 50% ownership interest in the Cottages.

(Doc. 125-21.)

At a meeting on December 30, 2010, Cross and Scott Westlake (and others) discussed the terms set forth in Cross's December 16 email, along with other new proposals for a deal between OCGC and BMO. Specifically, they discussed that OCGC would use Scott Westlake's $250,000 cash injection to pay vendors and, if any money remained, to M&I to satisfy OCGC's outstanding interest. They also discussed a one-year term for Scott Westlake's option to purchase the golf course's 50% interest in a property. The next day, Scott Westlake transferred $250,000 to OCGC.[7]

On April 25, 2011, BMO sent a notice of default to OCGC and Scott Westlake, informing them of a default on the OCGC Notes. On May 11, 2011, BMO sent notice to plaintiffs, informing them of an event of default under their Line of Credit and demanded payment.

On May 12, 2011, BMO sent a letter to M&I Trust,[8] directing it to (1) send BMO all cash funds currently held in the Investment Account; and (2) sell all publically traded securities held in the Investment Account and send the proceeds to BMO. The next day, M&I Trust transferred $1,547,797.33 to BMO, which BMO applied to plaintiffs' Line of Credit, and Scott Westlake simultaneously sent a "Direction Letter" to M&I Trust, requesting it cease liquidating the Investment Account funds and transferring them to BMO. Despite receiving that letter, M&I Trust transferred $1,665,004.15 to BMO on May 16, 2011, which BMO applied to plaintiffs' Line of Credit and Scott Westlake's Alico Guaranty. Over the course of the next few months, BMO continued to use funds

---

[7] In May 2011, the terms discussed throughout December 2010—along with other terms proposed in the intervening months—became a written document entitled "Fourth Modification Agreement."

[8] Because it is unclear what became of M&I Trust after BMO and M&I's merger, the court will refer to it as "M&I Trust."

from the Investment Account to pay the Felda, OCP, and OCGC Guaranties.  On May 23, 2011, Scott Westlake executed the Fourth Modification Agreement.  However, BMO never signed the Fourth Modification Agreement.

## II.  Legal Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A "genuine" factual dispute requires more than a mere scintilla of evidence.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  The party seeking summary judgment bears the initial burden of showing the absence of any genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  In making the summary judgment determination, the court must view the evidence and reasonable inferences in the light most favorable to the nonmoving party.  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  However, the nonmoving party may not rest on the pleadings but must set forth specific facts.  *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990).  Ultimately, the court evaluates "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law."  *Liberty Lobby*, 477 U.S. at 252.

## III.  Analysis

Plaintiffs bring five causes of action against BMO: (1) breach of contract based on breach of the covenant of good faith, (2) conversion, (3) promissory estoppel, (4) unjust enrichment, and (5) breach of agency contract.  The court will review each claim in turn.

### 1.  Breach of Contract Based on Breach of the Covenant of Good Faith

#### A.  Stating a Claim

Plaintiffs claim BMO breached its duty of good faith under Kan. Stat. Ann. § 84-1-304 by enforcing the dragnet clause. The pretrial order summarizes plaintiffs' position:

> [T]he enforcement of dragnet clauses of which the borrowers were not aware is commercially unreasonable. Since neither the Westlakes nor M&I Bank understood that the post-2007 documents authorized M&I Bank to use the Investment Account as collateral for Scott Westlake's obligations as a guarantor, it was commercially unreasonable and a breach of the covenant of good faith for M&I Bank to enforce that purported provision. The lack of good faith is particularly underscored by the fact that M&I Bank failed to disclose this significant change to the Westlakes even after Scott Westlake specifically asked if there had been any significant changes and he was told there had not been.

(Doc. 121 at 14.)

Kansas law implies a duty of good faith in every contract. *Law v. Law Co. Bldg. Assocs.*, 210 P.3d 676, 682 (2009) *rev'd on other grds*, 289 P.3d 1066 (Kan. 2012). "[I]n order to prevail on an implied duty of good faith and fair dealing theory under Kansas law, plaintiffs must (1) plead a cause of action for breach of contract, not a separate cause of action for breach of duty of good faith, and (2) point to a term in the contract which the defendant[ ] allegedly violated by failing to abide by the good faith spirit of that term." *Warkentine v. Salina Pub. Sch., Unified Sch. Dist. No. 305*, 921 F. Supp. 2d 1127, 1134 (D. Kan. 2013) (quoting *Wayman v. Amoco Oil Co.*, 923 F.Supp. 1322, 1359 (D. Kan. 1996)) (internal quotations omitted).

Plaintiffs' claim fails on both elements. First, plaintiffs have not pleaded a cause of action for breach of contract.[9] Rather, plaintiffs' claim is predicated on the change in language—and, therefore, purported change in scope—of the cross-collateralization provision[10] between the 2004/2006 Pledge Agreements and the 2007/2008 Pledge Agreements. Plaintiffs acknowledge that the 2008 Pledge

---

[9] Indeed, the court believes plaintiffs' claim is one of misrepresentation disguised as a breach of the duty of good faith. This is supported by reading plaintiffs' response. For instance, plaintiffs state: "The misrepresentations are not themselves the breach." (Doc. 149 at 30.) Yet, plaintiffs repeatedly discuss their claims in the context of BMO's alleged misrepresentations—indeed, misrepresentations are mentioned eleven or more times. (*See id.* at 21–22, 23, 24 26, 27, and 28.)

[10] Although the Pledge Agreements entitle the provision "cross-collateralization," such a provision is more commonly referred to as a "dragnet clause." For clarity, the court will refer to that provision as a "dragnet clause" throughout the remainder of the provision.

Agreement is "the operative agreement under which [BMO] purported to act when it improperly liquidated the assets of the [Investment] Account" but contend that the 2004, 2006, and 2007 Pledge Agreements are relevant "to the extent they show that there was a material change in scope of the dragnet clause in 2007 that was not disclosed to Plaintiffs even when Plaintiffs specifically inquired as to whether there had been any significant changes." (Doc. 149 at 23, n. 2.) Plaintiffs do not claim that BMO breached the 2008 Pledge Agreement, or any other agreement for that matter. Plaintiffs' claim fails because the scope of the duty of good faith is confined by the purposes and express terms of the contract. *SCO Group, Inv. v. Novell, Inc.*, 578 F.3d 1201, 1224 (10th Cir. 2009). No independent cause of action exists. *Warkentine*, 921 F. Supp. 2d at 1134; *see also Marland v. Safeway, Inc.,* 65 Fed. App'x. 442 (4th Cir. 2003).

Second, and similarly, plaintiffs do not point to a term in the 2008 Pledge Agreement that BMO allegedly violated by failing to abide by the good faith spirit of that term. Rather, plaintiffs focus on the "*major* change to the breadth of the dragnet clause" between two contracts (the 2006 Pledge Agreement and the 2007 Pledge Agreement) that, as plaintiffs acknowledge, are not the operative agreements. (Doc. 149 at 24 (emphasis in original).) Because plaintiffs do not identify any term in the 2008 Pledge Agreement BMO allegedly violated, plaintiffs' claim fails as a matter of law.

### B.  Waiver

Even if plaintiffs presented a viable claim, there is a question as to whether plaintiffs waived their right to challenge the dragnet clause or BMO's enforcement of it. BMO argues plaintiffs waived the right to challenge the dragnet clause by permitting BMO to enforce the dragnet clause with respect to the Alico Guaranty. Plaintiffs insist they accepted BMO's use of the assets in the Investment Account to satisfy the Alico Guaranty because they "determined it was in their best interest not to pursue that particular claim." (Doc. 149 at 31.) Plaintiffs therefore contend their waiver as to the

Alico Guaranty did not waive their claims on the other guaranties (Felda, OCP, and OCGC).  In its reply, BMO points out that plaintiffs' argument is duplicitous: If enforcing the dragnet clause benefitted Scott Westlake, BMO acted in good faith; if enforcing the dragnet clause did not benefit Scott Westlake, BMO did not act in good faith.  For the reasons set forth below, the court finds that plaintiffs intentionally and voluntarily relinquished a known right—the ability to challenge the enforceability of the dragnet clause in the 2008 Pledge Agreement.

Under Kansas law, waiver is the intentional and voluntary relinquishment of a known right. *First Nat'l Bank of Omaha v. Centennial Park, LLC*, 303 P.3d 705, 714 (2013).  Conduct inconsistent with the known right may demonstrate waiver.  *Id*.  While knowledge of the right being waived is an essential element, waiver can still be found through constructive knowledge.  *Sultani v. Bungard*, 131 P.3d 1264, 1267 (2006).

Plaintiffs acknowledge the operative contract in this case is the 2008 Pledge Agreement and concede that dragnet clauses are permitted under Kansas law.  BMO enforced the dragnet clause according to its terms and used funds from the Investment Account to satisfy the plaintiffs' default on their Line of Credit.  Plaintiffs do not object to this use of funds from the Investment Account.  BMO then used additional funds from the Investment Account to satisfy plaintiffs' Line of Credit and Scott Westlake's Alico Guaranty.  Again, plaintiffs do not object to this application of the Investment Account funds.  Later, BMO used more Investment Account funds to satisfy Scott Westlake's Felda, OCP, and OCGC Guaranties.  These are the uses to which plaintiff objects.  Again, it appears plaintiffs objected only when the satisfaction of the underlying obligations did not benefit them:  Plaintiffs argue that BMO may use funds from the Investment Account to satisfy the Alico Guaranty, but it may not use funds to satisfy the Felda, OCP, OCGC Guaranties.  The only reason plaintiffs provide for their inconsistent treatment of the guaranties is that satisfying the Alico Guaranty was in their best

interest—specifically, it allowed them to "step into the bank's shoes and sue to obtain the [real] property and sue to obtain the property from Alico." (Doc. 149 at 31.)  The court therefore finds plaintiffs intentionally and voluntarily relinquished the right to challenge whether BMO enforced the dragnet clause in good faith, as plaintiffs authorized BMO to enforce the dragnet clause as to the Alico Guaranty differently than the Felda, OCP, and OCGC Guaranties for no legally sufficient reason.

In sum, plaintiffs fail to state or prove the essential elements of their claim for breach of the duty of good faith.  Alternatively, plaintiffs waived their right to challenge whether BMO acted in good faith in enforcing the dragnet clause.  The court grants summary judgment in favor of BMO with respect to plaintiffs' claim for breach of contract based on a breach of the duty of good faith.

### 2. Conversion

Plaintiffs next contend BMO is liable for conversion for directing the liquidation of, receiving, and using the Investment Account's funds to satisfy debts other than their Line of Credit and the Alico Guaranty.  Conversion is the unlawful exercise of ownership over the property of another. *Carmichael v. Halstead Nursing Ctr., Ltd.*, 701 P.2d 934, 938 (1985).  BMO does not dispute it exercised ownership over the funds in the Investment Account.  Rather, BMO argues its exercise of ownership was lawful.  The court agrees.

The Restatement of Torts states:

> A person may be entitled to the immediate possession of a chattel as the result of some past transaction.  Thus, a conditional sale vendor or a chattel mortgagee may repossess a chattel from his vendee or mortgagor upon failure of the latter *to comply with the terms of the contract if a valid agreement between the parties so provides*.

Restatement Torts (Second) § 272, cmt b (emphasis added).  Plaintiffs do not dispute the validity of the 2008 Pledge Agreement.  Thus, BMO, as mortgagee, may repossess the collateral pledged by plaintiffs, the mortgagor, because the 2008 Pledge Agreement provided such a remedy.  With an

unchallenged—and thus presumably valid—agreement between the parties, plaintiffs have not

demonstrated that BMO *unlawfully* retained plaintiffs' property.  The court therefore grants summary

judgment in favor of BMO.

### 3.   Promissory Estoppel

Plaintiffs' third claim is for promissory estoppel.  They argue BMO (then M&I Bank) orally

promised Scott Westlake that, if he made a $250,000 contribution to OCGC by December 31, 2010,

BMO would credit that contribution against his guaranty obligations.  Scott Westlake transferred

$250,000 to OCGC on December 31, 2010.  After receiving that payment, BMO failed to perform on

its alleged promises.  BMO disputes neither of these facts.[11]  However, BMO argues plaintiffs' claim is

barred by the Kansas Credit Agreement Statute, Kan. Stat. Ann. § 16-118(a).

Kan. Stat. Ann. § 16-118(a) bars actions based on "unwritten agreements to lend or delay

repayment of money, effectively operating as a statute of frauds for 'credit agreement[s].'"  *Bank*

*Midwest, N.A. v. Millard*, No. 10-2387-JAR, 2012 WL 2583385, at *3 (D. Kan. July 3, 2012).  Under

Kansas law, "credit agreement" is defined, in pertinent part, as:

> "Credit agreement" means an agreement by a financial institution to lend or delay
> repayment of money, goods or things in action, to otherwise extend credit or to
> make any other financial accommodation.  For purposes of this act the term
> "credit agreement" does not include the following agreements: Open-end or
> closed-end promissory notes, real estate mortgages, security agreements, guaranty
> agreements . . . .

Kan. Stat. Ann. § 16-117(a) (West).

Plaintiffs argue their claim is not barred because § 16-117(a) expressly excludes guaranty

agreements from the definition of "credit agreement."  While plaintiffs are correct, modifications to

existing agreements are treated differently.  For instance, "an attempt to orally modify a promissory

note imposes additional duties upon the creditor, and, under Kansas law, transforms the promissory

---

[11] BMO does dispute whether its promises were sufficiently definite so as to satisfy the necessary elements of promissory estoppel.  But the court does not reach this question in resolving this case.

note into a credit agreement for which a writing is required." *Millard*, 2012 WL 2583385, at *3 (citing *Bittel v. Farm Credit Servs. of Cent. Kan.*, 962 P.2d 491, 495–97 (Kan. 1998)).  Here, it is uncontroverted that the parties attempted to modify many agreements, including one of Scott Westlake's guaranty agreements—indeed, the eventual written document incorporating the parties' December 2010 discussions was entitled "Fourth *Modification* Agreement" (emphasis added). Plaintiffs do not attempt to distinguish this case from *Millard*.  The court adopts the rationale in *Millard*, finding no apparent reason to treat modifications to guaranty agreements differently than modifications to promissory notes.  Therefore, the court finds plaintiffs' attempted modification of Scott Westlake's guaranty agreement is a "credit agreement" under § 16-117(a).

As such, § 16-118(a) bars plaintiffs claim, unless the agreement is (1) in writing and (2) signed by the creditor and the debtor.  K.S.A. § 16-118(a) ("A debtor or a creditor may not maintain an action for legal or equitable relief or a defense, based in either case upon a failure to perform on an alleged credit agreement, unless the material terms and conditions of the agreement are in writing and signed by the creditor and the debtor.)  Plaintiffs' claim fails both criteria.  First, the agreement was not in writing at the time of Scott Westlake's $250,000 transfer.  For that reason, plaintiffs' claim is barred by § 16-118(a).  Second, even assuming the agreement was in writing, the writing (Fourth Modification Agreement) was only signed by the debtor (Scott Westlake).  It is undisputed that BMO did not sign that agreement.  Thus, even if the court found the parties' agreement was in writing, § 16-118(a) still bars plaintiffs' claim because the Fourth Modification Agreement was not signed by both the debtor (Scott Westlake) and the creditor (BMO).

### 4.  Unjust Enrichment

Next, plaintiffs bring a claim of unjust enrichment arising from BMO's retention of Scott Westlake's $250,000 payment (or a portion thereof) to OCGC on December 31, 2010.

Under Kansas law, the elements of a claim of unjust enrichment are (1) a benefit conferred upon a defendant by plaintiff; (2) an appreciation or knowledge of the benefit by the defendant; and (3) the acceptance or retention of that benefit by the defendant under circumstances that make it inequitable for the defendant to retain the benefit without payment of its value. *Haz-Mat Response, Inc. v. Certified Waste Servs. Ltd.*, 910 P.2d 839, 847 (Kan. 1996).

BMO makes a two-fold argument that no benefit was unjustly retained, which is based on the following uncontroverted facts:

- Scott Westlake paid the $250,000 to his own company, OCGC—not BMO;

- OCGC used most of that money to pay other creditors in order to keep the business afloat;

- Using the remaining money, OCGC paid off then-outstanding loan interest to BMO;[12]

- Scott Westlake was a guarantor of OCGC;

First, BMO argues it received no benefit because Scott Westlake paid the $250,000 to OCGC. But BMO concedes it received approximately $60,000 of that payment—the remaining money after OCGC paid its other creditors. At the very least, that $60,000 directly benefitted BMO. To say otherwise borders on disingenuousness. Moreover, plaintiffs urge the court to view the *entire* $250,000 payment as a **direct** benefit to BMO because the payment was made with the intention of keeping OCGC from going out of business, which increased the probability that OCGC would be able to repay the debts it owed to BMO. Given the court must view the evidence and inferences in favor of plaintiffs, the court rejects BMO's argument because the evidence clearly shows BMO received *some* benefit from Scott Westlake's $250,000 payment on December 31, 2010.

Second, BMO contends that any benefit it retained was not *unjustly* retained. The argument goes as follows. Because Scott Westlake paid the $250,000 to OCGC, only OCGC could pay BMO

---

[12] The remaining portion paid to BMO appears to be $60,000.

whatever amount remained from that payment after OCGC paid its other creditors.  And, because

OCGC owed interest on its loan(s) to BMO, any money OCGC paid to BMO satisfied OCGC's

outstanding debt.  Indeed, even Scott Westlake intended for BMO to retain whatever portion of the

$250,000 payment remained after OCGC paid its other creditors in order to satisfy OCGC's

outstanding interest debt.  (*See* Doc. 125-21 at 2–3 ("Scott Westlake injects $250,000 into the golf

course to bring vendors current *and pay interest to the Bank*") (emphasis added); *see also* Doc. 149-10

at 7, pp. 39.)  Scott Westlake cannot now claim BMO has unjustly retained the money he intended be

paid to BMO.  For these reasons, the court grants summary judgment in favor of BMO on plaintiffs'

claim of unjust enrichment.

### 5. Breach of Agency Contract

The last claim plaintiffs bring is one for breach of agency contract, alleging BMO breached the

JMAA.  BMO argues plaintiffs have not identified a single provision in the JMAA (Doc. 125-2) that

BMO allegedly breached.  The court agrees.  Both plaintiffs' complaint (Doc. 1-1 at 14, ¶ 82) and the

pretrial order (Doc. 121 at 15) confirm the JMAA is the contract plaintiffs allege BMO to have

breached.  In their response, plaintiffs again fail to identify a single provision in the JMAA that was

breached.  In fact, the only clause in the JMAA that plaintiffs ever reference is a clause in paragraph

three, but they only do so to rebut BMO's contention it is an exculpatory clause.

Although the rest of plaintiffs' response discusses the 2006 and 2007 Control Agreements,

plaintiffs never previously pleaded a breach of contract with respect to those control agreements.  To

the extent the contract(s) underlying plaintiffs' claim for breach of agency contract involve the 2006 or

2007 Control Agreements, the court notes that neither plaintiffs' complaint nor the parties' pretrial

order identify the 2006 or 2007 Control Agreements as the contracts underlying plaintiffs' claim for

breach of *agency* contract.[13]  For these reasons, the court grants summary judgment in favor of BMO as to plaintiffs' claim for breach of agency contract.

## IV.  Conclusion

Plaintiffs have not established that a genuine issue of material fact exists as to each of the five claims they brought.  Therefore, the court finds summary judgment is appropriate.

**IT IS THEREFORE ORDERED** that defendant BMO's motion for summary judgment (Doc. 124) is granted.

**IT IS FURTHER ORDERED** that all other pending motions (Docs. 116, 122, 126, 127, 128, and 129) are denied as moot.

This case is closed.

Dated this 17th day of June, 2015, at Kansas City, Kansas.

s/ Carlos Murguia
**CARLOS MURGUIA**
**United States District Judge**

---

[13] The court notes that plaintiffs' response regarding this claim generally reads like a claim for breach of fiduciary duties. Plaintiffs attempted to assert that exact type of claim in the pretrial order, but the court sustained BMO's objection that it was a new claim not previously pleaded.